# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**NAKIA WILSON**, *et al.*,

     *Plaintiffs*,

**v.**

**COURTYARD MARRIOT ISLA VERDE BEACH RESORT**, *et al.*,

     *Defendants*.

Civ. No. 22-01529 (MAJ)

---

## OPINION AND ORDER

### I. INTRODUCTION

This wrongful death action is brought by Nakia Wilson et al. ("Plaintiffs") against Courtyard Marriott Isla Verde Beach Resort ("Marriott") and Iguana Sport Services Corp. ("Iguana") under 31 L.P.R.A. § 5141 of the Puerto Rico Civil Code.[1] (**ECF No. 30**). Plaintiffs' Complaint (the "Complaint") alleges Defendants are liable for negligently causing the deaths of Ryan and Rawle Fortune ("Decedents"), two brothers who tragically drowned at Isla Verde Beach on November 9, 2021. On June 4, 2024, Judgment was entered dismissing the case against the Marriott (**ECF No. 131**), leaving Iguana as the sole remaining defendant.[2]

Before the Court is a Motion for Summary Judgment (the "Motion") submitted by Iguana. (**ECF No. 141**). In the Motion, Iguana argues that Plaintiffs have failed to establish that Iguana breached a duty of care owed to Decedents. The Court agrees.

---

[1]     In addition to the Marriott and Iguana, Plaintiffs also sued HR Properties, Inc., International Hospitality Enterprises, Inc., and Chubb Insurance Company of Puerto Rico. (**ECF No. 30 at 2 ¶ 1.1**).

[2]     Dismissal against Marriott also included the dismissal against HR Properties, Inc., International Hospitality Enterprises, Inc., and Chubb Insurance Company of Puerto Rico. (**ECF No. 131**).

After examining the record and controlling law, the Court **GRANTS** Iguana's Motion for Summary Judgment.

## II.    BACKGROUND

Plaintiffs filed this action on November 7, 2022, seeking damages for the deaths of Decedents. (**ECF No. 1**). At the time of their deaths, Decedents were guests at the Marriott. During their stay, while swimming at the Isla Verde beach adjacent to the hotel, Decedents drowned. Plaintiffs, who are family members of Decedents, allege that Iguana negligently caused their deaths. (**ECF No. 30**).

Iguana is an entity that holds a sub-contract with the Marriott. By the terms of their agreement, Iguana is responsible for providing towels, umbrellas, and beach chairs to pool guests and beach guests at the hotel. (**ECF No. 142 at 1 ¶ 3; ECF No. 151 at 8**).

Plaintiffs contend that Iguana had an affirmative duty to warn and to rescue Decedents from the hazards of the ocean, and that, by its failure to do so, Iguana negligently caused their deaths. (**ECF No. 150**). In the absence of adequate mechanisms to protect hotel guests from the hazards of the ocean, Plaintiffs argue, Iguana is liable to Plaintiffs for the wrongful deaths of their family members. *Id*. Iguana asserts, on the other hand, that Plaintiffs misconstrue the applicable duty of care standard, and that Iguana did not have an affirmative duty to warn or rescue Decedents. (**ECF No. 141**).

## III.    FACTS

### A. Findings of Fact

Under Local Rule 56, "A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." Under the Rule, "[u]nless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation[.]" D.P.R. LOC. CIV. R. 56(C). As the First Circuit

has lamented, "violations of this local rule are astoundingly common and constitute an unnecessary burden to the trial court's docket and time." *López-Hernández v. Terumo Puerto Rico LLC*, 64 F.4th 22, 26 (1st Cir. 2023). Yet "compliance with Local Rule 56 is a mandate, not a suggestion." *Ramírez-Rivera v. DeJoy*, 693 F. Supp. 3d 210, 213 (D.P.R. 2023); *see also López-Hernández*, 64 F.4th at 26 ("We have repeatedly emphasized the importance of complying with said local rule and have implored litigants to comply or ignore it 'at their peril.'"). Accordingly, where a fact set forth by the movant has not been properly controverted, it will be deemed admitted. D.P.R. Loc. Civ. R. 56(e) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.").

Where, as here, the Plaintiffs' Response to Defendant's Statement of Uncontested Material Facts fails to comply with the plain requirements of Local Rule 56, "[t]he court [has] no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D.P.R. Loc. Civ. R. 56(e). The Court therefore has no obligation to independently probe the record for evidence supporting the Plaintiffs' interminable and ambiguous response.[3] (**ECF No. 151**).

After applying Federal Rule of Civil Procedure 56(c) and Local Rule 56(c), and only crediting material facts that are properly supported by a record citation and uncontroverted, the Court makes the following findings of fact:[4]

---

[3]    Local Rule 56(c), also known as the "anti-ferret rule," is "intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." *López-Hernández v. Terumo P.R. LLC*, 64 F.4th 22, 26 (1st Cir. 2023). Nevertheless, in the interest of thoroughly adjudicating all relevant issues raised by the instant Motion, the Court has "ferreted" through the record to determine the undisputed material facts in the record.

[4]    In making findings of fact, the Court analyzed Plaintiff's Amended Complaint (**ECF No. 30**), Defendant's Answer to the Amended Complaint (**ECF No. 36**), Defendant's Motion for Summary Judgment (**ECF No. 141**), Defendant's Statement of Uncontested Material Facts (**ECF No. 142**), Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (**ECF No. 150**), Plaintiffs'

1. On November 9, 2021, Ryan and Rawle Fortune drowned while swimming at Isla Verde Beach. (**ECF No. 151-28**; **ECF No. 151-29**).

2. On November 9, 2021, the National Weather Service issued several warning statements regarding high rip currents risks for Isla Verde Beach. (**ECF No. 151-6 at 14–15**).

3. At the time of their deaths, the Decedents were guests at the Courtyard Marriott Isla Verde Beach Resort. (**ECF No. 151-5 at 212**).

4. Iguana is an "Itinerant Business" licensed to provide massage services and beach chair, beach umbrella, and cabana rentals. (**ECF No. 148-1**).

5. The Marriott contracted Iguana to provide services at the Courtyard Marriott Isla Verde Beach Resort. (**ECF No. 143-1 at 35**); (**ECF No. 151 at 6**); (**ECF No. 153-2**).

6. The Marriott's contract with Iguana expressly required Iguana to provide employees who are responsible for furnishing hotel guests with towels, beach chairs, and umbrellas.[5] (**ECF No. 142 at 1 ¶ 3**); (**ECF No. 143-1 at 38**); (**ECF No. 151 at 6**); (**ECF No. 153-2**).

7. The Marriott directly charged guests fees for the provision of beach chairs and beach umbrellas. (**ECF No. 153-3 at 5**).

8. Iguana charged the Marriott a monthly management fee. (**ECF No. 143-1 at 95–96**).

9. Iguana's employees wore uniforms provided by the Marriott when on duty. The uniforms bear the insignia of the Marriott. (**ECF No. 143-1 at 42**).

10. The agreement between the Marriott and Iguana did not expressly require that Iguana provide security personnel at the hotel or at the adjacent beach. (**ECF No. 142 at 2 ¶ 4**); (**ECF No. 143-1 at 114**); (**ECF No. 153-2**).

11. The agreement between the Marriott and Iguana did not expressly require that Iguana provide lifeguards at the hotel or at the adjacent beach. (**ECF No. 142 at 2 ¶¶ 5–6**); (**ECF No. 143-1 at 115**); (**ECF No. 153-2**).

12. The agreement between the Marriott and Iguana did not expressly require that Iguana provide medical personnel or equipment. (**ECF No. 142 at 2 ¶¶ 7–8**); (**ECF No. 143-1 at 115**); (**ECF No. 153-2**).

13. The agreement between the Marriott and Iguana did not expressly require that Iguana monitor ocean conditions or post warnings regarding the water conditions at the beach. (**ECF No. 142 at 2 ¶¶ 11–12**); (**ECF No. 143-1 at 117, 118, 126, 127**); (**ECF No. 153-2**).

14. Iguana operated its business under a permit issued by the Puerto Rico Department of Natural and Environmental Resources ("the Operating Permit" or "the Permit"),

---

Response to Defendant's Statement of Uncontested Material Facts and Statement of Additional Facts (**ECF No. 151**), relevant exhibits to these filings, and the totality of the record.

[5]    The Court notes that undisputed evidence in the record establishes that Iguana provided additional ancillary services, such as picking up small debris near the hotel pool or on the adjacent beach and straightening out chairs. (**ECF No. 143-1 at 40–41**). Iguana's License also provides that Iguana may perform massage therapy services. (**ECF No. 148-1**).

(**ECF No. 142-2**), and under a License issued by the Municipal Government of Carolina ("the License"). (**ECF No. 148-1**).

15. The Permit did not expressly require that Iguana provide warnings regarding dangerous swimming conditions. (**ECF No. 142-2**).

16. The Permit did not expressly require that Iguana provide a lifeguard on the beach. (**ECF No. 142-2**).

17. The Permit did not expressly require that Iguana provide safety equipment or medical personnel. (**ECF No. 142-2**).

18. The License identified Iguana as an "Itinerant Business." (**ECF No. 148-1**).

19. The Operating Permit required that Iguana's business "shall limit itself to the operation and deployment of chairs and beach umbrellas." (**ECF No. 142-2 at 2 ¶ 12**).

20. The Operating Permit prohibited Iguana from obstructing the public's access to the beach. (**ECF No. 142-2 at 3 ¶ 22**).

21. The Operating Permit stated that Iguana is "responsible for the cleanliness, maintenance, and safety of the area during the time authorized for operation by the Department." (**ECF No. 142-2 at 3 ¶ 22**).

22. The Operating Permit stated that the operation of Iguana's business is "subject to weather conditions" and requires that Iguana exercise "prudence in climatic conditions." (**ECF No. 142-2**).

23. When the conditions in the ocean appeared dangerous, administrative personnel at the Marriott were responsible for making the final decision whether to warn guests and/or to restrict hotel operations on the beach. (**ECF No. 143-1 at 110–111, 118**); (**ECF No. 153-11 at 70–71**); (**ECF No. 153-14 at 28–32**); (**ECF No. 151 at 35 ¶ 78**); (**ECF No. 172 at 35 ¶ 39**).

24. When the Municipality of Carolina issued warnings regarding unsafe water conditions, the warnings were issued to the Marriott. (**ECF No. 153-14 at 29, 32, 35**); (**ECF No. 153-11 at 37–38, 71**).

25. When the Marriott received notifications from the Municipality of Carolina that water conditions were unsafe, managerial staff at the Marriott were responsible for making the final decision to issue any warnings and/or to restrict access to the beach. (**ECF No. 153-11 at 70–71**).

## B. Evidence Excluded from the Record

The facts set forth above present a complete account of all material facts in the record that are not subject to genuine dispute. In reaching these findings, the Court has discarded multiple affidavit statements as inadmissible. Specifically, Plaintiffs insist that multiple statements set forth in an affidavit submitted by Phillip Ruiz ("Mr. Ruiz"), a

lifeguard who works at a beach close to the Marriott, create a genuine dispute of material

fact. The relevant portions of the affidavit are the following:[6]

> During one of the visits at the Courtyard Marriott there was an intervention by the
> hotel staff assigned to the beach area, and others, with a guest that had to be pulled
> out of the beach by hotel beach personnel; Sandra Santos was present during this
> event, as was the Municipal Police and one of the Carolina beach lifeguards who
> arrived to see what was happening.

**(ECF No. 151-13 at 2 ¶ 3(c))**.

> During the 2013 visit I asked employees in the pool-beach area regarding any prior
> events or occurrences at the beach with guests; they answered that on average they
> assist five guests per week who were struggling with the currents while swimming
> at the beach. One employee added that he was not a lifeguard.

**(ECF No. 151-13 at 2 ¶ 3(d))**.

Neither statement may properly be considered on summary judgment. Pursuant

to Federal Rule of Civil Procedure 56(c)(4), an affidavit submitted in opposition to a

motion for summary judgment must be based on "personal knowledge." *See Pérez v.

Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001). Affidavits are a disfavored form of

proof under Rule 56(c)(4),[7] and the "personal knowledge" standard is exacting. *See id.*;

---

[6]    The remainder of the affidavit does not include any information that is material to the legal issues
presented in this case. For instance, Mr. Ruiz alleges that, during a visit to the Marriott, he "explained to
the staff at the towel station, pool and beach chairs area about the currents that the beach has in this area
near the hotel and that they should take lifeguard training if they were going to rescue bathers in order to
be prepared." (**ECF No. 151-13 at 2**). As explained below, whether Iguana was subject to a heightened
duty to provide lifeguard services at the beach adjacent to the Marriott is a question of law that requires the
Court to look to the nature of Iguana's business operations and the scope of the contractual responsibilities
Iguana assumed under its agreement with the Marriott. The fact that a private citizen allegedly approached
Iguana's employees and offered his personal opinion that they "should take lifeguard training" does not
establish that Iguana had an obligation to do so under the law.

[7]    Plaintiffs argue that the infirmities of the affidavit should be disregarded because the Iguana
allegedly failed to take active steps to ensure that Ruiz was deposed. (**ECF No. 185 at 12**). That is not an
accurate description of what took place during the course of discovery. Depositions were originally
scheduled for June and July 2023. (**ECF No. 25**). Months later, in September 2023, Iguana was informed
that Mr. Ruiz was a potential witness. (**ECF No. at 12**). On March 15, 2024, Plaintiffs provided all
defendants with Mr. Ruiz's first affidavit. *Id.* That document included no allegations that would appear to
specifically implicate the liability of Iguana. (**See ECF No. 153-17**). Later, on April 10 and April 17, Iguana
cancelled its scheduled depositions of Mr. Ruiz. (**ECF No. 185 at 12**). Finally, on April 30, 2024, the final
day of discovery, Plaintiff produced a supplemental affidavit from Mr. Ruiz that includes the statements in

*see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) (describing affidavits as generally "subject to... infirmities"). Any portions of an affidavit that fail the "personal knowledge" requirement may be excluded. *See Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 687 (1st Cir. 2023). In applying Rule 56(c)(4), a district court must "approach the declaration with a scalpel, not a butcher's knife, disregarding only those portions that are inadmissible and crediting the remaining statements." *Id.* (citations and quotations omitted).

"[A] bare assertion that a statement is based on the affiant's personal knowledge will not suffice; rather, the affidavit must be factually specific and explain the basis for that knowledge." *Navedo v. Nalco Chem., Inc.*, 848 F. Supp. 2d 171, 179 (D.P.R. 2012) (*citing Perez*, 247 F.3d at 315). An affidavit that does not "contain enough specifics [or] speak meaningfully to matters within [the affiant's] personal knowledge" may not be considered. *Cadle Co. v. Hayes*, 116 F.3d 957, 961 (1st Cir. 1997); *see also Pérez*, 247 F.3d 303 (striking an affidavit statement where it "purport[ed] to be based on personal knowledge," yet was "totally lacking in specificity about the identity" of the corporate defendant's alleged representatives with whom the affiant allegedly interacted). For that reason, "[s]tatements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e),

---

question. *Id.* Six days earlier, on April 24, 2024, the Plaintiffs had filed a motion informing the Court that a preliminary settlement agreement had been reached between Plaintiffs and several defendants, leaving Iguana as the last adverse party standing. (**ECF No. 101**).

    The "sham affidavit" rule, which may be invoked to strike a last-minute affidavit that contradicts prior deposition testimony, is not applicable where there is neither a prior deposition nor a conflicting subsequent affidavit. *Compare with Reyes v. Pro. HEPA Certificate Corp.*, 74 F. Supp. 3d 489, 492 (D.P.R. 2015) (Noting that, under the sham affidavit rule, "[i]n determining whether the testimony constitutes an attempt to manufacture an issue of fact so as to defeat summary judgment, the court may consider the timing of the affidavit, as well as the party's explanation for the discrepancies"). Rather, as discussed, the standard set forth in Rule 56(c)(4) controls the admissibility of the affidavit statements at issue. *See* Fed. R. Civ. P. Rule 56(c)(4).

even when proffered in affidavit form by one who claims to have been a participant."
*Perez*, 247 F.3d at 316; *see also* FED. R. CIV. P. 56(e).

The Court is careful to approach the affidavit with "a scalpel, not a butcher's knife."
*See Pérez*, 247 F.3d at 315. The relevant portions of the Ruiz affidavit fail to provide a
sufficient factual basis to conclude that they are based on personal knowledge. First, the
statement beginning "there was an intervention by the hotel staff assigned to the beach
area" and ending "hotel beach personnel" is decisively vague. (**ECF No. 151-13 at 2 ¶
3(c)**).[8] That statement, which is curiously rendered in the passive voice, does not even
allege that Mr. Ruiz personally witnessed the events he describes. Neither does the
affidavit provide the date or time of the event, the factual basis of the conclusory allegation
that some of the staff in question were "assigned to the beach area," whether the staff were
employees of the Marriott or Iguana, a description as to who the "others" at the beach
were, how Mr. Ruiz distinguished between "staff assigned to the beach area" and "others,"
or the name of any person Mr. Ruiz purportedly identified as a member of the "hotel beach
personnel." In short, the statement fails to provide a sufficiently specific factual basis to
conclude that any of the individuals described in the statement were representatives of
Iguana, or that Mr. Ruiz himself had "personal knowledge" of the facts alleged in the
statement. Instead, like the statements excluded in *Pérez*, the factual specifics of this
statement are "undefined," "unnamed," "unspecified," and "amorphous." 247 F.3d at 316.

The entire paragraph beginning with the phrase "I asked employees in the pool-
beach area" and ending with "he was not a lifeguard" suffers from the same infirmities.

---

[8]    "During one of the visits at the Courtyard Marriott there was an intervention by the hotel staff
assigned to the beach area, and others, with a guest that had to be pulled out of the beach by hotel beach
personnel; Sandra Santos was present during this event, as was the Municipal Police and one of the Carolina
beach lifeguards who arrived to see what was happening." (**ECF No. 151-13 at 2 ¶ 3(c)**).

(**ECF No. 151-13 at 2 ¶ 3(d)**)).[9] The lack of factual specificity as to the identities of the persons involved and the date that the event took place renders the statement excessively vague. It is simply not sufficiently clear whether the "employees in the pool-beach area" were Iguana's employees. As a result, both statements are struck from the record.

This result is consistent with how other courts apply the exacting standard of Rule 56(c)(4). *See Pérez,* 247 F.3d at 316 (excluding statements in an affidavit that were "totally lacking in specificity about the identity of the "Volvo representatives" with whom [the affiant] ostensibly spoke, when those alleged conversations occurred, what was said, how Volvo [knew about the substantive allegations in the affidavit] and how [the affiant knew] the extent of Volvo's knowledge."); *see also Mackey v. Town of Tewksbury*, 15-CV-12173, 2020 WL 68243, at *2 (D. Mass. Jan. 7, 2020) (excluding statements alleging that police officers outside of affiant's house were "TPD officers," because the affiant had no personal knowledge of where the officers worked, even where there was no evidence in the record suggesting that law enforcement officers from other police departments had approached the affiant's house).

Moreover, even if it had included sufficient detail to establish "personal knowledge," the statement "they answered that on average they assist five guests per week" must be excluded because it is inadmissible hearsay offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801. While the "nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment[,]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), the material cited to

---

9        "During the 2013 visit I asked employees in the pool-beach area regarding any prior events or occurrences at the beach with guests; they answered that on average they assist five guests per week who were struggling with the currents while swimming at the beach. One employee added that he was not a lifeguard." (**ECF No. 151-13 at 2 ¶ 3(d)**).

support or dispute a fact must at the very least be capable of being reduced to an admissible form. *See Joseph v. Lincare, Inc.*, 989 F.3d 147, 155 n.4 (1st Cir. 2021). It is "black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted[,]" *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011) (citations and quotations omitted), and the speculative possibility that unnamed declarants could appear to testify is insufficient to establish that a hearsay statement could be reduced to admissible evidence at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (noting that evidence is not reducible to an admissible form where "there is nothing to indicate" that an affiant's "statements (which were based on the statements of unknown co-workers) will lead to admissible evidence.") (citations and quotations omitted); *see also Joseph*, 989 F.3d at 156 n.4 (1st Cir. 2021) (*citing Jones*, 683 F.3d at 1293–1294). Furthermore, the statement in question does not fall within a hearsay exemption because it does not provide a sufficient factual basis to believe that the hearsay declarants are employees or representatives of Iguana. *Cf. Mackey*, 2020 WL 68243, at *2 (excluding affiant statement on hearsay grounds because affiant could not show that he had personal knowledge that police officers outside his residence were employed by the defendants). And even if it did, Rule 801 expressly provides that a hearsay statement purportedly "made by the party's agent or employee on a matter within the scope of that relationship" may not "by itself establish... the existence or scope of the relationship." FED. R. EVID. 801(d)(2). Because the statement concerning a purported "intervention by the hotel staff assigned to the beach area" may not be properly considered, the only evidence in the record suggesting that assisting hotel guests struggling in the ocean was within the scope of employment is the hearsay statement itself. That statement is hearsay and may not "by itself establish the ... scope of the

relationship" between Iguana and its employees. *Id*. The statement therefore does not fall within the exemption of Rule 801(d)(2)(D).

Accordingly, the relevant portions from the Ruiz affidavit are struck from the record and are not considered by the Court.

## IV.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and only questions of law remain. *White v. Hewlett Packard Enterprise Co.*, 985 F.3d 61, 68 (1st Cir. 2021). "A genuine dispute is one that a reasonable factfinder could resolve in favor of either party." *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 7 (1st Cir. 2015) (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 16 (1st Cir. 2013)). "A fact is material if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trustees*, 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up).

To win summary judgment on a particular issue, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The party moving for summary judgment "bears the initial burden of showing that no genuine issue of material fact exists." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (citation omitted). This burden is met "when the moving party demonstrates that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 131 (1st Cir. 2014) (internal quotations and citation omitted).

In opposing a motion for summary judgment, the plaintiff "bears the burden of producing specific facts sufficient to" defeat summary judgment. *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations and citation omitted).

The Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Furthermore, the Court must review the record as a whole and avoid assessing the credibility or gauging the weight of the evidence presented. *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014).

The goal of "summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 56 (1st Cir. 2021). In short, for Iguana to prevail on summary judgment, they "must demonstrate that, even admitting well-pleaded allegations in the light most favorable to Plaintiff, the applicable law compels a judgment in its favor." *Vega- Martínez v. Hosp. San Antonio Inc.*, 18-cv-1055, 2022 WL 4539850, at *3 (D.P.R. Sept. 28, 2022).

## V.    APPLICABLE LAW AND ANALYSIS

Plaintiffs allege that Iguana's negligence caused the wrongful deaths of Decedents. In Puerto Rico, Article 1536 provides a cause of action for negligence. 31 L.P.R.A. § 10801. A claim for negligence has four elements: the plaintiff must prove that (1) the defendant had a legal duty (2) the defendant breached that duty, and (3) the defendant's breach caused the plaintiff to suffer (4) an injury. *See Horowitz v. Luxury Hotels Int'l of Puerto Rico, Inc.*, 322 F. Supp. 3d 279, 283–84 (D.P.R. 2018) (*citing Vázquez-Filippetti v. Banco Popular de Puerto Rico*, 504 F.3d 43, 49 (1st Cir. 2007)). In this case, the parties dispute whether Iguana owed a heightened duty of care to Decedents.

As the First Circuit has explained, "duty is defined by the general rule that one must act as would a prudent person under the circumstances." *Id*. Under Puerto Rico law, there are three sources of legal duty. Duty can be (1) created by a special relationship between

the parties, such as the relationship between hotel and guest; (2) created by statute, regulation, or contract; or (3) based upon a traditionally recognized duty of care particular to the situation. *De Jesús Adorno v. Browning Ferris Indus. of Puerto Rico, Inc.*, 992 F. Supp. 121, 124 (D.P.R. 1998), *aff'd*, 160 F.3d 839 (1st Cir. 1998); *see also Horowitz*, 322 F. Supp. 3d at 283–84. While the law recognizes that "every man owes to his fellow creatures that degree of care and vigilance as will enable him to enjoy his life with safety," *Vázquez-Filippetti*, 504 F.3d at 50, n.2 (citations and quotations omitted), a person is not liable for the injuries suffered by another unless they caused that injury by breaching a particular duty of care. Thus, where a person has been negligent by omission, "the defendant must have been under a duty to act[.]" *Rodríguez-Quiñones v. Jiménez & Ruiz, S.E.*, 402 F.3d 251, 254 (1st Cir. 2005). As the Supreme Court of Puerto Rico has cautioned, the owner of a business open to the public is not an insurer for the security of all clients to the business; rather, the business is only obligated to exercise reasonable care for the protection of its clientele. *Colón-Garcia v. Toys "R" Us, Inc.*, 139 D.P.R. 469, 473 (P.R. 1995). "[W]hether a duty exists is typically a legal question for the court." *Candelario Del Moral v. UBS Fin. Servs. Inc. of Puerto Rico*, 699 F.3d 93, 100 (1st Cir. 2012).

## A. Iguana is not an "innkeeper" subject to a heightened duty of care.

Because a hotel effectively "substitutes a home", Puerto Rico law holds hotels to "a heightened duty of care and protection." *Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 124 F.3d 47, 51 (1st Cir. 1997) (citations and quotations omitted). As the First Circuit has noted, this heightened standard of care is a "stringent standard." *Mejías-Quirós v. Maxxam Property Corp.*, 108 F.3d 425, 427 (1st Cir. 1997). By this standard, an "innkeeper" must provide a "reasonable measure of security for the protection of their

guests." *Montalbán v. Centro Com. Plaza Carolina*, No. RE-86-415, 1993 WL 840023 (P.R. Offic. Trans. Feb. 19, 1993) (citations and quotations omitted). Even under this heightened standard, however, hotels are liable to their guests only for reasonably foreseeable harms. *See, e.g., Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 124 F.3d 47, 52 (1st Cir. 1997) (holding that heightened duty of care was not breached by hotel when rabid mongoose invaded hotel premises and bit a sunbathing guest). As noted above, hotels are not "insurers" for all possible harms that might befall their guests. *Pabón-Escabí v. Axtmayer*, 90 D.P.R. 20, 25 (P.R. 1964).

For the purposes of determining the relevant standard of care in a negligence action, Puerto Rico law defines an "innkeeper" as "any person, firm, corporation, or other type of business organization, engaged for profit, in the operation of a hotel, and [...] shall include the officers, agents, and employees of such [entity], unless the context otherwise requires[.]" 10 L.P.R.A. § 711(b). Under the statute, independent contractors that work at a hotel are not necessarily exempted from the heightened duty of care: "[t]he fact that meals are offered in a restaurant or café operated within the hotel premises by a person other than the innkeeper shall not preclude the [restaurant] from being classified as a hotel." 10 L.P.R.A. § 711(a).

There is no dispute that Iguana is "engaged for profit" in its business with the Marriott. *Cf. Grasis v. WIN Access Inc.*, No. 13-cv-1226, 2017 WL 8948953 (D.P.R. Mar. 28, 2017) (holding that the homeowner's association in question was not an "innkeeper" because it was not engaged in business "for profit"). However, the fact that an entity is "engaged for profit" in a business that provides lodgings to guests, however, is not dispositive. *See Pejcic v. Choice Hotels Int'l, Inc.*, 511 F. Supp. 3d 85, 89 (D.P.R. 2020) (holding that defendant franchisor and defendant marketing firm were not subject to the

heightened duty of care because they did not "run the day to day operations" of the hotel in question and the parties' agreements did not require defendants to provide security at the hotel); *see also Willis v. Río Mar Resort – MTG Co.*, LLC, No. 21-cv-1515, 2023 WL 5899911 (D.P.R. Sept. 11, 2023) (relying on *Pejcic* and rejecting "economic benefit theory"). Instead, pursuant to the text of 10 L.P.R.A. s. 711(b), the operative question is whether Iguana is engaged "in the operation of a hotel" within the meaning of the statute, as plaintiffs contend, "unless the context otherwise requires[.]" 10 L.P.R.A. § 711(b). As the savings clause of § 711(b) suggests, this is a fact-intensive inquiry: it is a question of "the *nature* of the services rendered by [the defendant's business]," and "[e]ach case turns on its own facts." *Jacob v. Eagle Star Ins. Co.*, 640 F. Supp. 117, 119 (D.P.R. 1986) (emphasis in original) (holding that an independent taxi driver transporting travelers from the airport to a hotel was not subject to the heightened duty of care).

In opposing Summary Judgment, Plaintiffs rely on *Coyne v. Taber Partners I*, 53 F.3d 454 (1st Cir. 1995). In *Coyne*, the defendant was the owner and operator of the Ambassador Plaza hotel in San Juan. Prior to the incident that gave rise to the lawsuit, a local union representing taxi drivers had grown frustrated by competition from hotel-operated taxis and called a strike. *Coyne*, 53 F.3d at 456. In order to ensure that Plaintiff, a newly arriving guest, could reach their hotel, the defendant dispatched an employee to transport plaintiff from the airport to Ambassador Plaza. When the vehicle crossed a picket line on the way back to the hotel, Coyne was injured by a projectile that struck the vehicle. The First Circuit found that, "though Coyne was in a car, she was just as much a ward of the hotel as if she was in her suite or in the lobby." *Id.* In *Coyne*, the First Circuit emphasized that "unlike in *Jacob*, the defendant *is* a hotel, albeit one that is being sued because it elected to furnish transportation services ancillary to its principal business."

*Id.* at 458 (emphasis in original). Plaintiff's appeal to *Coyne* is therefore inapt: unlike the defendant in *Coyne*, Iguana is not itself a hotel.

The heightened duty of care imposed on innkeepers "stem[s] from the character of the enterprise in which the defendant engages and from the special nature of the relationship between the defendant and its invitees." *Id.* at 458; *see also Rodríguez-Quiñones v. Jiménez & Ruiz, S.E.*, 402 F.3d 251, 254–55 (1st Cir. 2005) (reasoning that because "fault or negligence" must be based on "the omission of the steps which may be required by the character of the obligation and which may pertain to the circumstances of the persons, time, and place," any heightened duty must be "commensurate with the circumstances attendant to [the defendant's business] operations."). Because the innkeeper's heightened duty of care derives from the nature of a hotel business and the special relationship of trust between hotels and their guests, there is a crucial difference between, on the one hand, a contractor hired by a hotel to perform a narrow range of functions and, on the other, a business that partakes in the essential functions of a hotel. As the Supreme Court of Puerto Rico has emphasized, hotels "are obliged to maintain a reasonable measure of security for the protection of their guests [...] *contrary* to a contractor or a business whose scope of activity does not encompass the need to provide said protection." *See Montalbán v. Centro Com. Plaza Carolina*, No. RE-86-415, 1993 WL 840023 (P.R. Feb. 19, 1993) (quoting *Estremera v. Inmobiliaria Rac Inc.*, 109 D.P.R. 852 (P.R. 1980)) (emphasis added).

The Marriott contracts with Iguana for the limited purpose of providing beach chairs, towels, and umbrellas to hotel guests enjoying the hotel pool or the adjacent beach. Plaintiffs have not produced evidence that Iguana was hired by the Marriott to conduct any significant additional services, such as furnishing meals or providing security at the

hotel.[10] *Cf.* 10 L.P.R.A. 711(a) (defining "hotels" with specific reference to the provision of "lodging and meals" and noting "the fact that meals are offered in a restaurant or café operated within the hotel premises by a person other than the innkeeper shall not preclude the establishment from being classified as a hotel"). Thus, Iguana does not "operate" the hotel or perform any of the core, traditional functions associated with innkeeping. *Compare Chapman v. E.S.J. Towers, Inc.*, 803 F. Supp. 571 (D.P.R. 1992) (applying the "utmost duty of care" to a security company defendant specifically hired by a hotel to provide security to guests) *with Pejcic*, 511 F. Supp. 3d (holding that defendant franchisor and defendant marketer "did not run the day-to-day operations" of a hotel based on their contractual agreements, and accordingly that they were not subject to a heightened duty to protect). Like the defendants in *Pejcic*, the defendant in this matter was "merely a company outsourced" by the Marriott to provide ancillary services. *Willis v. Río Mar Resort – MTG Co., LLC*, No. 21-cv-1515, 2023 WL 5899911 (D.P.R. Sept. 11, 2023) (summarizing the facts of *Pejcic*). Indeed, the Marriott employed its own security staff that issued orders to Iguana in the event that severe weather or unsafe conditions were anticipated. (**ECF No. 153-11 at 37–38; 70–71**).

The terms of Iguana's Operating Permit and License support the same conclusion. While Plaintiffs seize on the fact that the Permit states that Iguana's operations would be "subject to weather conditions," the Permit falls far short of requiring that Iguana mitigate the serious dangers of the ocean for guests of the Marriott, that Iguana provide any affirmative warnings about ocean conditions, or that Iguana provide any safety personnel

---

[10]    The additional ancillary services performed by Iguana, such as collecting litter on the beach adjacent to the hotel, *see supra* n. 1, are not analogous to the provision of security or dining services. The latter relate specifically to the traditional functions of a hotel, which serves effectively as a substitute for a home. *Woods-Leber*, 124 F.3d at 51. In contrast, the task of collecting trash in areas outside of the hotel cannot fairly be said to contribute to what makes the Marriott a "home away from home" for its guests.

or equipment.[11] Similarly, Iguana's License does not set forth any affirmative duties on the part of Iguana to protect guests of the Marriott from the dangers of the ocean. On the contrary, the License contemplates Iguana as an "itinerant" business for which the sole purpose was the provision of beach towels, beach chairs, and umbrellas. (**ECF No. 148-1**).[12]

Plaintiffs' additional attempts to characterize Iguana as an "innkeeper" are not persuasive. First, Plaintiffs' assertion that Iguana is liable under principles of agency law

---

[11]    Plaintiffs highlight that, in their application for the Permit, Iguana was required by local regulation to include "[a] study of marine currents, sediment movement and bathymetric contours[.]" (**ECF No. 150 at 18**). By local regulation, Plaintiffs add, "no application [for a Permit may be] filed incomplete or not signed by the petitioner or his duly authorized representative[.]" *Id.* Under these regulations, nonconforming applications for a Permit will not be processed. *Id.* Plaintiffs argue that these application requirements imposed on Iguana a continuous obligation to monitor ocean conditions.

With this argument, Plaintiffs miss the mark. There is no dispute that the Department of Natural and Environmental Resources issued Iguana a valid Permit to operate an itinerant business on Isla Verde Beach. (**ECF No. 142-2**). Plaintiffs do not provide any evidence that the issuance of the Permit was dependent on Iguana performing a study of ocean conditions. Moreover, since Iguana's application for the Permit was processed and granted, the actual terms of the Permit control. As noted above, the Permit does not require that Iguana monitor the ocean or issue warnings concerning ocean conditions. *Id.*

[12]    An "itinerant business" is defined as "any continuous or temporary commercial operation for the sale of goods and services at retail, lacking a fixed and permanent establishment, and operated in mobile units, on foot or by hand, or at a place which is not attached to any one place or real property, or if so, has neither permanent electric energy or water connections nor sanitary facilities." 21 L.P.R.A. § 4951. "Itinerant businesses" are regulated by 21 L.P.R.A. § 4952. By contrast, hotels are regulated by local agencies pursuant to 23 L.P.R.A. § 671e. Thus, as an "itinerant business", Iguana is not broadly covered by local regulations governing hotel operations. While Plaintiffs are correct that the regulations require that beach side hotels furnish beach chairs and towels for guests, P.R. Regs. TURISMO Reg. 8856, the contract between the Marriott and the Iguana concerns only those functions; there is no evidence that would support the inference that Iguana was responsible for matters beyond the provision of ancillary services at the pool and beach of the hotel, such as that of providing lifeguards or issuing warnings about weather conditions. Standing alone, the fact that Iguana contracted with the Marriott to perform some functions that fell within the ambit of local regulations covering hotels does not suggest that Iguana was contracted by the Marriott for the purpose of satisfying any additional regulatory obligations imposed on the Marriott. Local regulations requiring hotels to issue weather warnings to guests and provide lifeguards, for instance, are therefore not broadly applicable to Iguana, contrary to Plaintiffs' arguments. (**ECF No. 150 at 11**). Furthermore, the fact that a local regulation requires hotels to provide beach chairs and towels to guests does not affect the Court's holding that Iguana is not an "innkeeper", because such functions simply do not go to the special relationship of trust characteristic of the innkeeper and its guest as required by 10 L.P.R.A. § 711 and related caselaw.

is misplaced.[13] Second, contrary to Plaintiffs' arguments, there is no indication that Iguana operates a "joint enterprise" with the Marriott. Rather, the undisputed facts before the Court demonstrate that Iguana did not have an agreement with the Marriott that provided both parties with "an equal right to a voice in the direction of the enterprise[.]" *See* Restatement (Second) of Torts § 491 (1965).[14] Once again, the undisputed evidence before the Court indicates that the Marriott operates a hotel at which the Iguana is sub-contracted to perform a narrow range of functions. There is no indication that Iguana's business purpose is anything other than the provision of beach towels, beach chairs, and umbrellas, much less that the Iguana and the Marriott stand on equal footing with respect to the administration of hotel affairs.

In sum, although Iguana was sub-contracted by the Marriott to perform a narrow range of functions on hotel grounds, the specific facts of this case compel the Court to find that Iguana is not a "hotel" within the meaning of local law. Plaintiffs have failed to introduce sufficient evidence or legal authority that would permit the Court to adopt any other conclusion.

---

[13]    As Plaintiffs correctly summarize, in Puerto Rico "an apparent principal may be held liable for the acts of its apparent agent where the apparent principal's actions led the plaintiffs to reasonably believe in its representation of authority and control over the apparent agent." *Grajales-Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 293 (1st Cir. 1999); (**ECF No. 150 at 15**). In an attempt to apply this principle to the facts of the instant case, however, Plaintiffs turn the rule on its head. Contrary to Plaintiff's framing, agency law sets forth when a principal may be held liable for the acts of its agents; it does not hold that agents are generally liable for the acts or omissions of their principals. *See generally* Restatement (Third) of Agency § 7.01, comment d (2006) ("Only an agent's own tortious conduct subjects the agent to liability under this rule. An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct; there is no principle of "respondeat inferior.").

[14]    According to the Restatement (Second) of Torts § 491 (1965) "The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *See also Ocasio v. Hogar Geobel Inc.*, 693 F. Supp. 2d 167, 178 (D.P.R. 2008) (applying the elements set forth in the Restatement (Second) of Torts).

**B.  Iguana did not assume a heightened duty of care by contract.**

Even in the absence of a "special relationship," such as that between a hotel and its guests, a duty of care may arise by contract. *De Jesús-Adorno*, 992 F. Supp. at 124; *Pejcic*, 511 F. Supp.3d at 90 (rejecting arguments that defendants were either "innkeepers or otherwise had a contractual obligation to foresee the unfortunate incident and keep the hotel's premises safe."). Thus, Iguana would be subject to a relevant duty of care if it expressly or impliedly assumed such responsibilities through its contract with the Marriott.

There is no evidence in the record that would support an inference that Iguana formed an express agreement with the Marriott that required Iguana to provide security personnel, lifeguards, medical personnel, or safety equipment at the hotel or at the adjacent beach. Neither is there is any evidence in the record that would support a finding that Iguana expressly assumed responsibility for posting warning signs, closing access to the beach, or issuing warnings to the hotel guests.

With the record devoid of evidence suggesting that Iguana formed an express agreement with the Marriott by which it assumed a heightened responsibility for the safety of hotel guests, Plaintiffs argue instead that the record raises an issue of fact as to whether the parties formed an implied agreement to that effect. Specifically, Plaintiffs argue that Iguana's past performance of the contract with the Marriott establishes that Iguana was, pursuant to the implied terms of the agreement, responsible for guaranteeing the safety of hotel guests at the hotel pool and the adjacent beach. (**See ECF No. 185**).

The record does not provide support for the Plaintiffs' argument. Instead, the record is unequivocal that the Marriott never delegated its responsibility to decide whether to warn guests about hazardous ocean conditions or restrict access to the beach.

Indeed, in her sworn deposition, Sandra Santos ("Ms. Santos"), the head of security at the Marriott, stated that the general manager of the Marriott was responsible for deciding whether to warn guests about dangerous ocean conditions or whether to restrict hotel operations on the beach. (**ECF No. 153-11 at 70−71**). Plaintiffs do not identify any piece of evidence that contradicts that testimony.

In an attempt to create a genuine dispute of material fact, Plaintiffs point to evidence that conversations took place between the Marriott and Iguana regarding ocean safety. Specifically, Plaintiffs cite to the deposition testimony of Ms. Santos, who testified that when the Marriott decided to restrict beach access for hotel guests, employees of Iguana would verbally communicate those decisions to hotel guests.[15] According to Plaintiffs, this evidence demonstrates a pattern of conduct by Iguana that would permit a jury to find that Iguana and the Marriott formed an implied contract allocating safety-related responsibilities to Iguana. (**ECF No. 185**). However, as noted above, Ms. Santos stated unequivocally in her testimony that, when conditions in the ocean appeared dangerous, administrative personnel at the Marriott were responsible for deciding whether to warn guests and whether to restrict access to the beach. (**ECF No. 153-11 at 70-71**). Other facts in the record corroborate this assertion. (**ECF No. 143-1 at 110−111**,

---

[15]    The quote in question reads as follows:

   Q: [...] In your position as chief of Security, then as it relates to beach safety, has there been any moments since you have been here in that position, where you have told guests: "We're not going here. The beach is closed, you can't access the beach through our hotel"?

   A: Okay. If I, personally, or the staff?

   Q: You, you.

   A: The pool staff, and the Security, and the boys from the beach [...] that put the chairs and the umbrellas? Yeah, they have.

(**ECF No. 153-11 at 36-37**).

118); (**ECF No. 153-14 at 28−32**); (**ECF No. 151 at 35 ¶ 78**); (**ECF No. 172 at 35 ¶ 39**). In addition, the record is clear that when the Municipality of Carolina issued warnings regarding unsafe water conditions, the warnings were issued to the Marriott, not to Iguana or to both. (**ECF No. 153-14 at 29, 35**); (**ECF No. 153-11 at 37-38, 71**). Nor there is anything on the record to suggest that the Marriott asked the Municipality of Carolina to also notify Iguana of any climatological warnings.

These facts are not contradicted by any other evidence in the record. Standing alone, the mere fact that Iguana participated in safety-related conversations with the Marriott would not permit a reasonable jury to find that the Marriott delegated its safety responsibilities to Iguana.[16] Because there is uncontroverted evidence in the record that the Marriott retained the responsibility of warning guests about unsafe conditions in the ocean and of deciding whether to restrict access to the beach, the notion that Iguana assumed those duties by implied contract could only be supported by speculation or conjecture. As such, Plaintiffs have not proffered evidence sufficient to permit a

---

[16]     Plaintiffs cite to the deposition of Pedro Pagán ("Mr. Pagán"), an employee for Iguana, to further press their argument that the record shows a pattern of past performance demonstrating that the Marriott delegated its ocean safety related duties to Iguana. The deposition testimony in question, however, does not support the Plaintiffs position. Mr. Pagán does not contradict Ms. Santos' statement that the Marriott remained responsible for deciding whether to issue warnings to guests or restrict access to the beach:

> A. Every time that there is a high tide or there's some hazard at the beach, Sandra and I, we always communicate to take the decision of whether to close the beach or to warn them. To warn them more that literally "do not get in."
>
> Q. Okay. And are you the one warning Sandra?
>
> A. She to me. Besides that I see the waves.

(**ECF No. 153-14 at 32**). Mr. Pagán's testimony confirms that the Marriott staff remained responsible for the safety of hotel guests on the beach. It would require too much speculation to conclude from the mere fact that Iguana's employees participated in these conversations with Ms. Santos concerning beach safety that the Marriott had delegated its unique beach safety related duties to Iguana by contract. Moreover, when asked expressly who was responsible for deciding whether to issue warnings to guests or restrict access to the beach, Mr. Pagán confirmed Ms. Santos' testimony by expressly stating that it was Ms. Santos and the Marriott that was in charge of the decision.

reasonable jury to find that Iguana assumed an implied contractual responsibility to issue warnings to guests of the Marriott or to restrict access to the beach adjacent to the hotel.

This case is a far cry from *Chapman v. E.S.J. Towers, Inc.*, 803 F. Supp. 571 (D.P.R. 1992), where the court applied an "utmost duty of care" to a security company defendant specifically hired by a hotel to provide security to guests. Far from establishing "a contractual obligation to foresee the unfortunate incident and keep the premises safe," the agreement between Iguana and the Marriott did not include any provisions making Iguana responsible for providing a lifeguard or safety equipment, erecting warning signs, issuing alerts to guests, or rendering first aid. *See Pejcic*, 511 F. Supp. 3d at 90 (holding that defendant franchisor and defendant marketer "did not run the day-to-day operations" of a hotel based on their contractual agreements, and accordingly that they were not subject to a heightened duty to protect). As such, there is not sufficient evidence in the record to permit a reasonable fact-finder to determine that Iguana had assumed contractual duties of the type that would subject to it to a heightened duty of care. On the contrary, the record indicates that the Iguana was simply responsible for providing guests with beach chairs, towels, and umbrellas, along with other ancillary services. The Court therefore finds that Iguana did not assume a relevant duty of care by contract.

**C.  Iguana did not breach a traditionally recognized duty of care.**

Because Iguana is not an "innkeeper" subject to a heightened duty of care, the only remaining question is whether Iguana breached a "traditionally recognized duty of care particular to the situation."[17] *De Jesús-Adorno,* 160 F.3d at 842. As noted above, "duty is

---

[17]    Plaintiffs also raise arguments rooted in principles of premises liability. (**ECF No. 150 at 17**) The Court need not address these arguments at length, however, as Iguana was not the "owner or operator" of the hotel. *See Márquez v. Casa de España de Puerto Rico*, 59 F.Supp.3d 409, 413-414 (D.P.R. 2014) ("*the owner or operator* of a commercial establishment has a duty to exercise reasonable care to maintain those areas that are accessible to the public, so as to avoid injury to its patrons") (emphasis added); *compare*

defined by the general rule that one must act as would a prudent person under the circumstances*." Horowitz*, 322 F. Supp. 3d at 283–84. In short, Iguana may only be held liable for the tragic deaths in question if the evidence is sufficient to permit a finding that, under "the circumstances of the persons, time, and place[,]" a reasonably prudent person in Iguana's shoes would have had an obligation to prevent Decedents from entering the ocean. "This inquiry is case-specific and fact-dependent." *Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 88 (1st Cir. 2020) (quotations and citations omitted).

As noted above, in Puerto Rico the owner of a business open to the public is not an "insurer" for the security of all clients to the business. *Colón-García* 139 D.P.R. at 473. Bearing this principle in mind, the Court finds that Iguana did not breach any relevant duty of care by failing to affirmatively prevent Decedents from entering the ocean on November 9, 2021. Indeed, to hold Iguana liable on these facts would simply be to impose the heightened duty of care applicable to "innkeepers." Absent any heightened duty of care, it is not reasonable to demand that Iguana – who was merely responsible for providing beach towels, beach chairs, and umbrellas at Isla Verde beach – thereby became responsible for the serious hazards of the ocean. It is likely for this reason that Plaintiffs have not argued at length that Iguana breached a traditional duty of care, instead urging the Court to hold Iguana to the heightened standard. However, as explained above, that stringent standard is not applicable to Iguana.

---

*Santiago v. Sup. Grande*, 166 D.P.R. 796, 815 (2006) (noting that premises liability may only apply to areas under the dominion and control of the owner or operator) *with Brown v. U.S.*, 557 F.3d 1 (1st Cir. 2009) (noting that the critical test under Massachusetts premises liability law is "who had the right to control the property."). It is worth noting that "the duty to keep business premises reasonably safe is a nondelegable principle." *Paredes v. Hilton Int'l of Puerto Rico*, 896 F. Supp. 223, 229 (D.P.R. 1995). In any event, Iguana did not assume by contract any responsibilities to maintain the safety of the premises of the Marriott.

Accordingly, the Court concludes that Iguana did not breach a traditional duty of care on the undisputed facts of the instant case.

### VI.    CONCLUSION

In its role as a subcontractor for the Marriott, Iguana did not assume the heightened duty of care imposed by local law on hotels. That stringent standard of care is therefore not applicable to the facts of the instant case. Instead, Iguana was merely responsible for performing a narrow range of functions on the Marriott's behalf. The Court does not find that Iguana's contractual duty to provide hotel guests with beach chairs, towels, and umbrellas carried with it the responsibility to warn or rescue hotel guests from the hazards of the ocean.

For those reasons, the Court finds that there is no genuine dispute of material fact in this matter. Defendant's Motion for Summary Judgment is accordingly **GRANTED.** Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 13th day of December 2024.

<u>**/s/ María Antongiorgi-Jordán**</u>
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**